# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| Donmonic Perks, Antoine Thompson, and Thomas Prater, and Khaliah Hines | ) ) ) | |
| *Plaintiffs*, | ) ) ) | |
| vs. | ) ) ) | 2:20-cv-02129 |
| Highland Community College, Eric Ingmire, in his individual capacity as Vice President for Student Services, and Bryan Dorrel, in his individual capacity as Athletic Director of Highland Community College. | ) ) ) ) ) ) ) | |
| *Defendants*. | ) ) ) ) | |

## COMPLAINT AND JURY DEMAND

Plaintiffs Donmonic Perks, Antoine Thompson, Thomas Prater, and Khaliah Hines, by and through their counsel, bring this action against Defendants Highland Community College ("HCC"), Vice President Eric Ingmire ("Ingmire"), and Athletic Director Bryan Dorrel ("Dorrel"), and allege as follows:

### PRELIMINARY STATEMENT

1.      This case challenges HCC's systemic practice of targeting African American student-athletes with disparate discipline and racially hostile treatment and seeks to compel HCC to eradicate its official policies driving the pervasive discriminatory treatment of black students on the school's campus, the majority of whom were or are student-athletes.

2.      HCC Security has an extensive history of singling out black students for dorm room and vehicle searches and the HCC administration regularly subjects black students to excessive sanctions for minor and even bogus infractions. HCC Security also maintains a practice of

profiling black student-athletes in the school's dining hall and often follows them from their dorm rooms to and from practice and class. Moreover, HCC contracts with the Highland Police Department ("HPD"), relying on its officers to serve as HCC Security and using HPD's services to engage in discriminatory surveillance and harassment of black student-athletes off-campus.

3.      HCC and its Athletic Director Bryan Dorrel have maintained a goal of reducing the number of African American student-athletes at HCC. To achieve this unlawful objective, Dorrel intentionally implemented a three-part strategy: (1) expel specific black student-athletes currently attending the school; (2) subject black prospective student-athletes to excessive and unjustified scrutiny prior to offering scholarships, including conducting background checks, conduct to which white recruits are not subjected; and (3) directing coaches to recruit more white prospective student-athletes and attempting to dissuade them from continuing to recruit black prospects.

4.      In the six months since HCC's plan to reduce the number of black student-athletes has been underway, an unprecedented number of black student-athletes have been expelled, forced to leave campus or simply driven away from the college by the pervasive harassment of HCC officials. Additionally, the 2020 football recruiting class at HCC includes a significantly lower number of black student-athletes than previous years.

5.      Plaintiffs in this case are young African American men and women who attended HCC during the Fall 2019 Semester. Mr. Perks, Mr. Thompson, and Mr. Prater left their homes in Missouri, Florida, and Indiana to move to Highland, Kansas to pursue their dreams of earning a college degree and playing football at the next level. Ms. Hines came to HCC on a scholarship to study and play on the women's basketball team.

6.      Plaintiffs were subjected to rampant racial harassment and discrimination committed or approved by HCC's highest-ranking officials. Together, these high-ranking officials made demeaning comments about Plaintiffs' "wild hair," disciplined them for purported rules infractions that were forgiven or ignored when committed by white students, and ultimately

expelled Mr. Perks, Mr. Thomson, and Mr. Prater pursuant to HCC's strategy to reduce the number of black athletes on campus.

7.      These violations of Plaintiffs' rights occurred pursuant to an official policy or custom of HCC implemented by its authorized policymakers and from a failure to properly train employees or implement policies protecting students' civil rights, meriting the imposition of municipal liability under 42 U.S.C. § 1983.

8.      Plaintiffs seek relief for the discrimination and harassment they suffered from all of the responsible parties.

<u>JURISDICTION AND VENUE</u>

9.      This court has subject matter jurisdiction over the Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because this action seeks a remedy under 42 U.S.C. §1983 and Title VI of the Civil Rights Act, 42 U.S.C. §2000d. Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights of the parties and to grant all further relief deemed necessary and proper. This court has supplemental jurisdiction over Plaintiffs' state contract law claims under 28 U.S.C. § 1367(a).

10.     Venue is proper in this action pursuant to 28 U.S.C. § 1391.

<u>PARTIES</u>

11.     Plaintiff Donmonic Perks Jr. is an 18 year-old African American male. Mr. Perks attended HCC from July 2018 through September 2019.  He came to HCC on a football scholarship and played as a wide receiver during the 2018 and 2019 seasons. Mr. Perks was expelled in September 2019 for allegedly using an offensive word in a conversation with an HCC Security officer. At the time of his expulsion, Mr. Perks wore his hair in wicks, a traditionally black hairstyle. He currently resides in Fort Scott, Kansas.

12.    Plaintiff Antoine Thompson is a 22 year-old African American male. Mr. Thompson attended HCC from August 2018 through December 2019.  He was on a full football scholarship for the duration of his time at HCC and played for the Scotties[1] as a wide receiver. In December 2019, Mr. Thompson was told by Defendants that he would not be permitted to return to campus for the Spring 2020 semester and was billed $6,000 for the Fall 2019 semester despite complying with the terms of his scholarship for the full season. Mr. Thompson wears his hair in dreadlocks, a traditionally black hairstyle. Mr. Thompson currently resides in Plant City, Florida.

13.    Plaintiff Thomas Prater is a 20 year-old African American male. Mr. Prater attended HCC from July 2019 through October 2019.  Mr. Prater played football as an offensive lineman for the duration of his time at HCC. Defendants told Mr. Prater that he would not be able to return to campus because he allegedly told a cafeteria worker that he did not want the food she was serving.

14.    Plaintiff Khaliah Hines is a 19 year-old African American woman. Ms. Hines is currently a student at HCC and has attended the school since August 2018. She has been a member of the women's basketball team for the entirety of her tenure at HCC. Ms. Hines has been subjected to regular surveillance and scrutiny by HCC security and administrators because of her race. She currently resides in Highland, Kansas.

15.    Defendant HCC is a public community college established and existing under the laws of the State of Kansas. HCC is a "person" within the meaning of 42 U.S.C. §1983.

16.    Defendant Eric Ingmire is the Vice President for Student Services at HCC. Pursuant to HCC's Student Handbook, Ingmire has authority to suspend students from classes and eject them from campus.[2] He oversees campus security and has ultimate authority to set practices

---

[1] The "Scotties" is the name designation for all of HCC's athletic teams.
[2] *Student Handbook 2019-2020*, HIGHLAND COMMUNITY COLLEGE, at 3, 7,  *available at* https://highlandcc.edu/caffeine/uploads/files/HCC%20Student%20Handbook%2019-20.pdf.

related to on-campus policing including, but not limited to, searches of student dorms and vehicles. At all relevant times, Defendant Ingmire was acting under color of state law. He is sued in his individual capacity.

17.     Defendant Bryan Dorrel is the Athletic Director of HCC and has served in the position since September 2019. Defendant Dorrel has authority to formulate policies and implement practices related to student-athlete recruitment, conduct, and eligibility.[3] He has ultimate discretion to impose athletics-related sanctions on student-athletes, including suspensions from practice and games.  At all relevant times, Defendant Dorrel was acting under color of state law. He is sued in his individual capacity.

FACTS

18.     HCC enrolls approximately 3,217 students, 87% of whom are white. Less than 6% of the student body is African American and the school has a diversity score of .24, nearly half the state average for a community college.[4]

19.     HCC receives several hundred thousand dollars per year from a variety of federal programs.

20.     HCC is also a member of the National Junior College Athletic Association ("NJCAA") and Kansas Jayhawk Community College Conference ("Jayhawk Conference").  As an NJCAA member institution, HCC is governed by the NJCAA Constitution and Bylaws, which specifically prohibit discriminatory conduct.  *See* NJCAA Constitution, Article II, Section 2 ("Unlawful discrimination is incompatible with this mission and detracts from the organization's goal of promoting healthy and fair competition. The NJCAA prohibits unlawful discrimination

---

[3] *Compliment and Complaint Process*, HIGHLAND COMMUNITY COLLEGE, *available at* https://highlandcc.edu/pages/hcc-compliment-and-complaint-process ("**Athletics**-Overseen by the Director of Athletics and deals with issues surrounding all athletic teams and NJCAA eligibility issues.")
[4] *Highland Community College Description*, COMMUNITY COLLEGE REVIEW, https://www.communitycollegereview.com/highland-community-college-highland-profile.

based on sex, race, color, national origin, ancestry, disability, religion, creed, sexual orientation, age or any other characteristic protected by applicable law in the NJCAA's governance, programs, regulations and employment practices").

21.     On information and belief, the majority of HCC's student-athletes are African American. In particular, during the 2019 season, 104 out of 111 members of the football team were black.

22.     The majority of HCC's student-athletes live in dorms or apartments on campus. Football players live primarily in Heritage, Rubeti, and Highlander Halls and eat their meals in the cafeteria located in the student union. Members of the women's basketball team who live on campus mainly live in Kansas Hall.  Plaintiffs resided in these halls and dined in the cafeteria while enrolled at HCC.

23.     Defendant HCC knowingly permitted a racially hostile environment to develop and flourish at HCC by targeting black students with additional law enforcement scrutiny, intentionally disciplining students in a racially discriminatory manner, and undertaking coordinated efforts to remove them from the school with the ultimate goal of replacing them with white student-athletes.

24.     On information and belief, the Board of Trustees led by Russell Karn hired President Deborah Fox and Defendant Dorrell in order to implement the Board's vision of a racially homogenous campus with fewer African American athletes. The Board selected both administrators notwithstanding their lack of qualifications because of their shared racially discriminatory views and willingness to execute the racially discriminatory policies that violated Plaintiffs' civil rights.

***Defendants Have Instituted Policies and Practices to Recruit Fewer Black Student-Athletes***

25.     Defendant Dorrel was hired as HCC's Athletic Director in Fall 2019. Upon information and belief, Dorrel had no prior experience as a collegiate athletic director, assistant athletic director or head coach.

26.     Defendant Dorrel regularly instructed the Football, Women's Basketball, and Men's Basketball coaches to recruit "more local kids" and "less Southern kids." On one occasion, Defendant Dorrel directed the women's basketball coach to "recruit more players that the local community could relate to."[5] When the coach asked Defendant Dorrel to specify what he meant, Defendant Dorrel replied "you know exactly what I mean by that."

27.     The women's basketball coach pushed back, explaining to Defendant Dorrel that many of his African American players who may not have been an obvious fit for a community like Highland had nevertheless thrived at the school. The coach gave a specific example of a black student who came to Highland with lower grades and a juvenile criminal record but went on to become a multiple time NJCAA Academic All-American. Defendant Dorrel responded that the student whom the coach described was exactly the type of student he did not want at the school.

28.     Defendant Dorrel also directed HCC's football coaches, including its former head coach, to recruit more "Kansas kids" and declared that they needed to get into more "local" schools. On information and belief, Dorrel also directed an assistant football coach to stop recruiting players that wore their hair in dreadlocks or wicks. Further, during a football game against Hutchinson Community College on October 5, 2019, Dorrel singled out one team member with dreadlocks and told former Athletic Director Greg Dietz that HCC was not going to "recruit any more of them."

---

[5] As is the case for football, HCC's women's basketball team is largely comprised of black student-athletes.

29.     Defendant Dorrel also instructed football coaches to start running background checks on black student-athletes before offering scholarships.

30.     In response to Defendant Dorrel's recruiting directive, HCC has reduced the number of black football players for the prospective 2020 season.  According to signing announcements publicized by HCC, black players now make up a significantly smaller portion of the new recruiting class than they have in previous years while white players make up a substantially greater proportion of the class than they have before.[6]

***Defendants Maintain a Policy and Practice of Targeting Specific Black Student-Athletes for Expulsion***

31.     Defendants have maintained a policy and practice of reducing the number black student-athletes on campus by identifying specific black student-athletes they want to remove from campus, including Mr. Thompson and Mr. Prater.

32.     On information and belief, Dorrel told multiple coaches in or around early November 2019 that for reasons unexplained it was important to get Mr. Thompson and another football player who wore his hair in dreadlocks kicked off campus by the end of the semester.

33.     During a meeting with Mr. Thompson in late November 2019, Defendant Dorrel warned him that he was "not going to get anywhere with [his] hair all wild like that" before telling him that he needed to find a new home for the spring semester.

34.     Defendant Ingmire similarly made comments suggesting that Mr. Thompson was not a good fit for the school because of his appearance, explaining that the school was no longer

---

[6] For the 2018 season, all but five of HCC's 97-person football team were black athletes. *See* 2018 HCC Football Roster, attached as Exhibit A. For the 2019 season, all but 6 of HCC's 123-person football team were black athletes. In both years, black students constituted 95% of the football team. *See* 2019 HCC Football Roster, attached as Exhibit B. Suddenly in 2020, following Defendant Dorrel's arrival at HCC, there has been a marked shift in recruitment demographics specifically to accommodate the addition of white players. Non-black students now make up approximately 27% of HCC's 2020 recruitment class, with fully 21% of the recruitment class being white athletes. *See* HCC Athletics Recruitment Posts from Twitter, Feb. 5-Feb. 20, 2020, attached as Exhibit C (identifying that at least 7 /33 current football recruits are white, and that at least 9/33 recruits are non-black).

tolerating his "thug" appearance, "wild hair," and "vibe."

35.     On information and belief, Defendants have also conducted background checks into current black student-athletes.

36.     On information and belief, Defendant Dorrel took it upon himself to conduct a background check into Mr. Prater and told several football coaches about a juvenile misdemeanor charge on his record.

### Defendants Maintain a Policy and Practice of Disparately Disciplining Black Student-Athletes

37.     Throughout Fall 2019, Defendants disciplined black student-athletes for rule violations that were forgiven or altogether ignored when committed by white student-athletes.

38.     In or around October 2019, Defendant Dorrel suspended two black football players for three games based on a report from the Highland Police that they smelled something like marijuana during an off-campus traffic stop even though no marijuana was found and the players were not arrested or otherwise cited. Conversely, Defendant Dorrel did not suspend or reprimand dozens of white student-athletes in the baseball, softball, and volleyball teams who were caught drinking underage by the baseball fields in or around October 5, 2019.

39.     On information and belief, Defendant Dorrel suspended a black football player from a game for missing a meeting with his counselor but took no action to discipline a white basketball player who missed a meeting with a counselor related to a criminal sex offense he committed prior to attending HCC.

40.     Additionally, Defendant Dorrel imposed objectively harsh sanctions on black student-athletes. Defendant Dorrel suspended Mr. Prater from playing in two football games for having his headphones in during class. On another occasion, Defendant Dorrel urged referees to file a complaint against HCC's black quarterback for complaining about the referees during a game— which resulted in the player receiving a two-game suspension.

41.     Upon information and belief, the foregoing unilateral intervention and micromanagement of issues involving HCC's individual student-athletes by Dorrel is highly unusual for an athletic director to engage in at the collegiate level, who normally defer to the head coach or other subordinate on matters involving player recruitment and discipline.

### HCC's Pattern and Practice of Unlawfully Targeting Black Student-Athletes with Surveillance

42.     HCC Security has maintained an official practice of targeting black student-athletes for dorm searches, vehicle searches, and general surveillance.

43.     Upon information and belief, at all relevant times, HCC contracted with members of the Highland City Police Department, including Chief of Police Brandon Whetstine, who also act as HCC Security officers.

44.     HCC Security routinely patrols the parking lot of Heritage Hall at night, shining their flashlights into the vehicles of black students and conducting baseless searches of those vehicles with the goal of uncovering evidence of wrongdoing.[7] HCC has enabled this practice via a written policy reserving the right to conduct warrantless searches of student vehicles absent probable cause.[8] On information and belief, HCC Security officers Brandon Whestine and Tom Williams will conduct late night searches of black student vehicles in the parking lot near Heritage and Highlander Halls—where most black student-athletes reside— approximately twice per week. HCC Security does not surveil the parking lots of other parts of campus with the same frequency.

---

[7] See Marcus Clem, *Highland faces racial row, civil rights investigation*, ATCHISON GLOBE (Jan. 29, 2020), *available at* https://www.newspressnow.com/news/local_news/highland-faces-racial-row-civil-rights-investigation/article_cd184f5a-42c9-11ea-a7b8-0fb2511afe4d.html (reporting that a particular black student athlete at HCC "would awaken in the middle of the night to a disturbance and discover authorities searching his vehicle without his permission and without any cause that was explained to him").

[8] See HCC Student Handbook 2019-2020, *supra* note 2, at 24 ("The College reserves the right to search students' vehicles parked on College property if there is a suspected […] violation of College policy, housing policy, or law […] Law enforcement officials and/or canines, used for the detection of illegal substances or unlawful possession of weapons, may accompany HCC officials during inspections").

45.     In addition to targeting the vehicles of black student-athletes for surveillance and searches, HCC Security regularly enters and conducts baseless searches of black student-athlete dorm rooms with the goal of uncovering evidence of criminal activity. HCC has enabled this practice via a written policy reserving the right to conduct warrantless searches of student dorm rooms absent probable cause.[9] On information and belief, HCC Security disproportionately executes these unlawful searches against black student-athletes.

46.     Mr. Perks was one of many black student-athletes whose room was entered and searched without consent or probable cause by campus security during the 2018-2019 school year. Mr. Perks also observed non-consensual searches and inspections of black student-athletes' rooms on 2-3 occasions during Fall 2019.

47.     HCC Security searched Mr. Thompson's room at least five times in the Fall 2019 semester. No prohibited items were found during searches.

48.     HCC Security also searched Mr. Prater's room at least twice in the two months he attended HCC. Mr. Prater regularly observed other students' rooms being entered and searched by campus security.

49.     Ms. Hines also had her dorm room in Kansas Hall searched by HCC Security Officer Whestine and the Director of Residential Life while she was living in Kansas Hall during the Spring 2019 semester.

50.     HCC Security also maintains a practice of driving slowly in their squad car behind black student-athletes while they are walking on and off campus.

---

[9] *Residence Life Handbook 2019*, HIGHLAND COMMUNITY COLLEGE, at 18, *available at* https://highlandcc.edu/caffeine/uploads/files/ResidenceLifeHandbookMarch2019.pdf ("The College reserves the right to enter student rooms […] when a violation of college policy or state/federal law is suspected […] Local law enforcement officials may accompany HCC officials during inspections").

51.     HCC Security followed Mr. Perks when he walked from his dorm to class or practice on at least four separate occasions.

52.     HCC Security followed Mr. Thompson while he was walking on campus on approximately three separate occasions. Security officers would also surveil him at the on-campus convenience store—sometimes in their capacity as security officers and other times in their role as HPD officers.

53.     Similarly, HCC security officers surveilled Mr. Prater and his teammates in the campus convenience store.

54.     HCC Security also maintains a practice of surveilling and interrogating black student-athletes in the dining hall.

55.     In particular, HCC Security officers Brandon Whestine and Tom Williams were regularly observed stationed in the dining hall looking up the roster pictures of black student-athletes on their phones to find out their names in order to investigate, search, and surveil them.

56.     HCC Security officers also closely watch black student-athletes while they are in the dining hall and question them about whether they have engaged in any type of misconduct.

57.     Surveillance activities are not limited to HCC Security officers. Board of Trustee member Karn attempted to search Ms. Hines's car while she was completing a photography assignment at HCC's softball field.

***Defendants Maintain a Practice of Suspending or Expelling Black Student-Athletes for Minor Infractions or No Reason at All***

58.     HCC has developed a Student Code of Conduct which outlines the severity levels of various rule violations.[10]

---

[10] *HCC Student Handbook 2019-2020*, *supra* note 2, at 10-14 ("HCC Violation Chart"; "HCC Sanctioning Chart"; and "HCC Sanctioning Rubric").

59.     Each rule violation has a recommended sanction and the code provides that HCC will not deviate from the recommendation absent a compelling justification.[11]

60.     Expulsion is only recommended for "high consequence" sanctions. Similarly, disciplinary suspension from housing is only recommended for "high consequence" sanctions.

61.     Mr. Perks and Mr. Prater were both expelled for alleged rule violations for "insubordination" and "cursing"— conduct for which HCC's own policies prescribe only low to medium sanctions.[12]

62.     On information and belief, HCC regularly removed black student-athletes from the dorms for violating rules carrying a low or medium recommended sanction. For instance, on information and belief, in the Fall 2019 semester two black student-athletes were suspended from housing because security staff smelled marijuana in their rooms even though marijuana odor is a "low consequence" sanction.[13]

63.     HCC's actions were deliberate and calculated, and done pursuant to an official policy or custom as demonstrated by the consistency of the college's conduct.

### *The Challenged Actions/Inactions are Pursuant to Defendant HCC's Official Policy*

64.     For all purposes relevant to this Complaint, Defendant HCC has acted and continues to act with intent to discriminate against Plaintiffs.

65.     The practices described herein constitute the official policy of HCC because they are longstanding and widespread practices about which the Board of Trustees and President Deborah Fox knew or should have known, but failed to remedy. Indeed, Mr. Thompson raised

---

[11] *Id.* at 11 ("Neither the conduct officer or hearing panel/appeals board will deviate from the range of recommended sanctions unless compelling justification exists to do so").

[12] *See infra* ¶¶ 77-80, 127; *HCC Student Handbook 2019-2020*, *supra* note 2, at 10, 13 (identifying "use of extremely obscene or offensive language" as an offense subject to a monetary fine and noting that "failure to identify oneself to College officials" is a "Low to Medium" offense).

[13] *HCC Student Handbook 2019-2020*, *supra* note 2, at 13.

concerns about the policing and disparate discipline of black student-athletes with the Board of Trustees before he was expelled in Fall 2019.

66.     Despite knowledge and adequate opportunity to learn of the misconduct of their agents and employees and to remedy such misconduct, HCC adopted, approved, and ratified the acts, omissions, and misconduct of Defendant Dorrel, Defendant Ingmire, and security personnel.

67.     Alternatively, these practices constitute the official policy of HCC because they were promulgated by Defendant Dorrel, Defendant Ingmire, and/or President Fox— each of whom have final policymaking authority on school disciplinary matters of student-athletes pursuant to state law; and/or to whom such authority has been delegated.

68.     Alternatively, Defendant HCC is liable for these practices because they have a policy of failing to adequately train or supervise HCC officials in the administration of discipline, which foreseeably resulted in the harms described herein.

69.     On information and belief, HCC never provided Defendant Ingmire, Defendant Dorrel, or security personnel with any form of training or supervision regarding Title VI of the Civil Rights Act or equity and inclusion. Moreover, HCC has never provided Defendant Ingmire, Defendant Dorrel, or security personnel with any training on the administration of discipline, campus policing practices, or student-athlete recruitment.

### *Donmonic Perks Suffers Discriminatory Harassment, Expulsion, and Damages as a Result of Defendants' Unconstitutional Actions and Policies.*

70.     Donmonic Perks is an 18 year-old African American male from St. Louis, Missouri. He is currently a student-athlete at Fort Scott Community College where he is majoring in sports medicine and playing football.

71.     From July 2018 through September 2019, Mr. Perks attended HCC on football and academic scholarships. Mr. Perks played as a wide receiver for the Scotties and maintained a 3.1 GPA.

72.     Mr. Perks was regularly subjected to searches and scrutiny by HCC Security during his tenure at the school.

73.     During the 2018-2019 school year, HCC Security searched Mr. Perks' dorm room as part of a random inspection for fake urine samples. HCC's Coordinator of Campus Safety & Security, Sarah Simmons, and the Director of Residential Life, Taylor Allen, entered Mr. Perks' room while he was at class and conducted a 10-minute search in which they moved and looked through a number of his personal effects, including his bed and some of his clothing.

74.      Mr. Perks did not consent to the search of his room.

75.     HCC Security followed Mr. Perks when he walked from his dorm to class or practice on at least four separate occasions.  On one occasion during the Spring 2019 semester, HCC Security officers followed Mr. Perks and 3 of his friends— all of whom were African American student-athletes— when they walked off campus. The security officers followed them in their squad car for approximately 5 minutes, never exceeding the pace that Mr. Perks and his friends were walking.

76.     On the morning of September 9, 2019, Mr. Perks went to the dining hall to eat breakfast. When he entered the dining hall, HCC security officers Scott Young and Brandon Whestine and Ms. Allen, Director of Residential Life, were asking student-athletes to write their name and campus room number on a sheet of paper. Mr. Perks gave his information to Ms. Allen and walked to the cafeteria line.

77.     While Mr. Perks was in the cafeteria line, Officer Scott approached him and told him he needed to write his name and room number down. Mr. Perks responded that he had written down the information.  Officer Scott directed Mr. Perks to write his information down a second time to which Mr. Perks replied that he had already written the information down and had given it to Ms. Allen.

78.     Believing that his answer was sufficient, Mr. Perks walked away from Officer Scott.

79.     The next day, Mr. Perks was unexpectedly called into a meeting with Ms. Simmons, HCC's Coordinator of Campus Safety. In the meeting, Ms. Simmons informed Mr. Perks that he was being expelled and had 10 hours to leave campus.

80.     When Mr. Perks asked why he was being expelled, Ms. Simmons told him that he was being expelled for cursing at Officer Scott in the dining hall the day before. She said that she was tired of her security officers being disrespected.

81.     Mr. Perks tried to explain to Ms. Simmons that he never cursed at Officer Scott, but had merely told Scott that he had already provided his name and room number to Ms. Allen the day before. Mr. Perks asked Ms. Simmons to review Officer Scott's body camera footage to confirm his version of the events.

82.     Ms. Simmons told Mr. Perks that security officers did not have their body cameras on in the cafeteria and reiterated that he had 10 hours to move out of his dorm and leave campus. She also informed him of his right to appeal his expulsion.

83.     Mr. Perks submitted his appeal on or about September 11, 2019. He also had a phone call with Defendant Ingmire and Ms. Simmons after he submitted the appeal. However, Defendant Ingmire denied his appeal without explanation just two days later on September 13, 2019.

84.     Neither insubordination nor cursing is a violation carrying a sanction that warrants expulsion under HCC's Code of Conduct.[14]  On information and belief, no white student-athletes attending HCC have received comparable discipline for similar violations.

---

[14] *See supra* notes 11 & 12.

85.     Over the four months following his expulsion from HCC, Mr. Perks was unable to enroll in school or play football. Finally in January 2020, Mr. Perks secured an offer to play football at Fort Scott Community College. His next football season will not start until Fall 2020.

86.     As a result of his expulsion from HCC, Mr. Perks is now a semester behind in his studies and has had to delay his football career for an entire year.

87.     Defendants' treatment has made Mr. Perks feel disrespected and emotionally distraught. Further, the policing practices of HCC's security team regularly made him fear for his physical safety and caused him to experience extreme anxiety.

### *Antoine Thompson Suffers Discriminatory Harassment, Expulsion, and Damages as a Result of Defendants' Unconstitutional Actions and Policies.*

88.     Antoine Thompson is a 22 year-old African American male who resides in Plant City, Florida.

89.     Mr. Thompson attended HCC from August 2018 through December 2019. He was on a full football scholarship and played two full seasons for the Scotties.

90.      Mr. Thompson had a series of negative interactions with HCC Security during his time at HCC.

91.     On May 9, 2019 after classes ended for the 2018-2019 academic year, HCC Security caused Mr. Thompson to be arrested because marijuana was found in a room where he had been playing video games.  He had to pay $1,000 in bail and missed his flight home.

92.     Mr. Thompson did not live in the room nor had he ever smoked marijuana in the room. Regardless, HCC Security detained him and called the Doniphan County Sherriff's Department who handcuffed him, transported him to Doniphan County jail, and placed him in a holding cell.

93.     When Mr. Thompson returned to campus for the 2019-2020 academic years, HCC Security immediately resumed regularly conducted searches of Mr. Thompson's room.

94.     During the searches HCC Security would rifle through Mr. Thompson's drawers and closets with flashlights. HCC Security rarely provided Mr. Thompson with a specific reason for the search.

95.     HCC Security followed Mr. Thompson while he was walking on campus on approximately three separate occasions. Security officers would also often follow him and his friends to the Stop Shop convenience store on campus and stand in the corner to see what they would purchase.

96.     Mr. Thompson submitted a handwritten complaint to HCC detailing his negative experiences with the security officers in early September 2019. However, the surveillance and searches he complained about continued.

97.     Indeed, HCC Security's scrutiny of Mr. Thompson intensified in late October and early November 2019.

98.     Throughout the Fall 2019 semester, Dorrel had told several assistant coaches of his intention to remove Mr. Thompson from the school by the end of the semester.

99.     Mr. Thompson was questioned by HCC Security in the dining hall on a near weekly basis. Security officers would often question Mr. Thompson about such trivial things as whether he had skipped the cafeteria line.  Not surprisingly, HCC Security actually issued him two $50 citations for allegedly skipping the cafeteria line in November 2019.

100.     On or about November 1, 2019, Mr. Thompson's position coach warned him that Dorrel was not going to allow him to return to HCC for the spring semester.

101.     In or around the end of November 2019, Dorrel summoned Mr. Thompson to his office for a meeting. Dorrel questioned him about his plans after HCC and whether he was being recruited by any four-year schools. When Mr. Thompson listed some of the schools he was being recruited by, Dorrel responded "do you think you'll get anywhere with your hair wild like that?"

102.    Mr. Thompson responded that he had always worn his hair in dreadlocks and it had not presented a problem before. Dorrel replied "well it's not going to be welcome around here." Defendant Dorrel ended the meeting by telling Mr. Thompson he might need to find a new home for the Spring semester.

103.    In or around the week of December 9, 2019, Defendant Ingmire called Mr. Thompson into two separate meetings.

104.    During the first meeting, Ingmire told Mr. Thompson that he was "not a good person for the area" and that HCC was no longer tolerating "skipping class," "sagging pants," and "wild hair." Ingmire also told Mr. Thompson that his "thug" appearance and "vibe" made HCC officials and members of the Highland community uncomfortable.

105.    Mr. Thompson tried to explain to Ingmire that he got along with everyone at HCC and that people did not have a problem with the way he looked.

106.    Ingmire then told Mr. Thompson that there had been "an incident" for which he was being investigated. Ingmire initially declined to provide more detail but eventually informed Mr. Thompson that he was being investigated for entering the dorm rooms of other students. Ingmire concluded the meeting by telling Mr. Thompson that he should leave at the end of the semester and "stay home."

107.    Mr. Thompson set up several additional meetings with Ingmire in an attempt to obtain more specific information about the accusations against him so that he would have the opportunity to prove his innocence.

108.    Defendant Ingmire admitted that he lacked any evidence that Mr. Thompson had engaged in the suspected conduct but further stated that he was still investigating the matter and "following up on leads."

109.    On December 15, 2019, Ingmire called Mr. Thompson into a final meeting. Ingmire told Mr. Thompson that he was not a good fit for the school and that he was not welcome to return to HCC the next semester.

110.    Despite numerous requests, Ingmire never provided Mr. Thompson with the specific disciplinary reason that he was being expelled and did not inform him of his right to appeal the decision.

111.    Several weeks later, HCC sent Mr. Thompson a $6,000 bill for the cost of attendance during the Fall semester even though he attended classes and played the entire semester pursuant to the terms of his scholarship agreement.

112.    The $6,000 bill has prevented Mr. Thompson from obtaining his HCC transcript, transferring credits, finishing his associate's degree and/or enrolling in another school.

113.    Moreover, Mr. Thompson has been grappling with anxiety and embarrassment over his expulsion. He is unsure whether he will be able to resume attending school and playing the sport he loves as a result of his expulsion from HCC. Mr. Thompson also feared for his safety in his interactions with the HCC campus security and experienced anxiety after each encounter.

114.    Mr. Thompson has many friends at HCC and maintains a strong desire to continue and ultimately complete his education at the institution.  If HCC ceases its discriminatory practices and policies, Mr. Thompson would like to return to HCC to resume his education.

### *Thomas Prater Suffers Discriminatory Harassment, Expulsion, and Damages as a Result of Defendants' Unconstitutional Actions and Policies.*

115.    Thomas Prater is a 20 year-old African American male who currently resides in Indianapolis, Indiana.

116.    Mr. Prater attended HCC from August through October 2019.  For those two months, Mr. Prater played on the Scotties football team.

117.    Mr. Prater was targeted by HCC security and administrators during his brief tenure at the school.

118.    Mr. Prater recalls having his dorm room searched on at least two separate occasions. The first search was conducted because HCC security allegedly smelled marijuana coming from his room. No marijuana was located during the search.

119.    Security officers told Mr. Prater that the second search was being conducted at random. No prohibited items were found during the second search.

120.    Security officers would also regularly follow Mr. Prater, slowly driving behind him while he walked on campus. HCC security officers followed Mr. Prater in September and October 2019 on four separate occasions.

121.    On one occasion, HCC security watched Mr. Prater and four of his black teammates while they were in the Stop Shop convenience store on campus and then followed them back to their dorm rooms.

122.    In addition to scrutiny from HCC Security, Defendant Dorrel personally conducted an investigation into Mr. Prater's juvenile criminal history.

123.    Defendant Dorrel discovered that Mr. Prater had been charged with misdemeanor shoplifting when he was 17 years old. Dorrel told a number of the football coaches about Mr. Prater's record.

124.    Defendant Dorrel subsequently suspended Mr. Prater from two games in early September 2019, allegedly for having his headphones in during class.

125.    In or around the first week of October 2019, Mr. Prater did not have his student ID so he entered the dining hall through a back door. A cafeteria worker saw Mr. Prater entering through the door and told him he needed to speak with the cafeteria supervisor before he would be served.

126.    The cafeteria supervisor permitted Mr. Prater to get his meal.  When Mr. Prater arrived at the cafeteria worker who had seen him entering through the back door, he told her he did not want the food she was serving.

127.    Two days later Mr. Prater was called into a meeting with Simmons. She told him that he had 48 hours to leave campus. When Mr. Prater asked why he was being forced out of school, Simmons responded that she only had the information that Defendant Dorrel had provided her which was that he had told the cafeteria worker that he did not want what she was serving earlier in the week.

128.    Simmons offered to help Mr. Prater with his appeal but told him he needed to leave campus.

129.    Mr. Prater never received any paperwork about his suspension and he returned to Indianapolis within 24 hours of being expelled.

130.    Mr. Prater is currently not in school and has fallen behind on his education and athletic career as a result of his expulsion from HCC.

***Khaliah Hines Suffers Discriminatory Harassment and Damages as a Result of Defendants' Unconstitutional Actions and Policies.***

131.    Ms. Hines is a 19 year-old African American woman who currently resides in Highland, Kansas.

132.    Ms. Hines is currently a student at HCC and has attended the school since August 2018. She came to HCC on a basketball scholarship to play as a shooting guard for the Scotties.

133.    HCC Security and administrators have targeted Ms. Hines with discriminatory surveillance and scrutiny because of her race since she first arrived on campus.

134.    On or about October 2, 2018, Ms. Hines was taking photographs of dew on the grass at the Softball field for her photography class early one morning.

135.     A few minutes later Board Member Karn arrived at the field and observed her from a distance. Ms. Hines felt uncomfortable but continued to take photographs. She noticed that Karn had approached her parked vehicle and was looking inside.

136.     After several minutes of surveilling Ms. Hines from a distance and visually inspecting the interior of her car, Karn approached Ms. Hines and asked why she was on "his field." Ms. Hines responded that she was just taking pictures of the grass.

137.     Karn started to get angry with Ms. Hines and again told her that she was on his field. Ms. Hines was scared and confused as to why Karn was upset with her. She promptly left the field.

138.     On information and belief, Karn complained about Ms. Hines to at least one HCC administrator and pressured them to discipline her for being on the softball field.

139.     In or around Fall 2018, HCC Security Officer Whestine observed Ms. Hines and her cousin sitting in her cousin's Chevy Impala in the dorm parking lot. Officer Whestine stopped Ms. Hines and her cousin when they started walking into her dorm room and said they had violated a traffic rule while they were sitting in the parking lot. She was threatened with a citation and her cousin received a ticket.

140.     During the Spring 2019 semester, HCC Security came to Ms. Hines's dorm room after she had engaged in an egg fight on the balcony with some of her teammates. Officer Whestine threatened Ms. Hines with a citation for destruction of property and insisted on searching her bedroom. Officer Whestine claimed he needed to search her bedroom to ensure nobody involved in the egg fight was hiding. However, once he was in her room Officer Whestine started opening the drawers of her dresser and rummaging through her clothes.

141.     Ms. Hines was also subject to baseless allegations of academic dishonesty at the start of the Spring 2020 semester. President Fox and Defendant Dorrel investigated her for academic dishonesty because she was able to improve her GPA during her summer courses.

23

142. On information and belief, white student-athletes who improve their grades during the summer term are not presumed to be cheating nor are they targeted for investigations by HCC administrators.

143. Ms. Hines's encounters with Karn and HCC Security have made her feel disrespected, anxious, and fearful while living on campus.

144. Additionally, HCC's suggestion that Ms. Hines engaged in academic misconduct has caused her considerable stress. She worries that the allegations may interfere with her future academic and athletic opportunities.

<u>CLAIMS FOR RELIEF</u>

**Count 1: Fourteenth Amendment Equal Protection Claim**
**Discriminatory Surveillance and Discipline**
**(42 U.S.C. §1983-*All Plaintiffs against All Defendants*)**

145. Plaintiffs repeat and reallege paragraphs 1-144.

146. The Federal Constitution protects Plaintiffs from disparate treatment on the basis of race. *See* U.S. Const. Amend XIV.

147. Defendants by disciplining Plaintiffs more harshly than similarly situated white students with the intent to discriminate against them on the basis of race, have violated Plaintiffs' equal protection rights.

148. Further, Defendants surveilled, searched, and scrutinized Plaintiffs because they are African American in violation of the Equal Protection Clause of the Fourteenth Amendment.

149. Defendants' challenged disciplinary actions were taken pursuant to HCC's official policies, practices, and customs. All actions taken by Defendants Dorrel and Ingmire were done while acting under the color of state law and had the effect of depriving Plaintiffs of rights secured by the Constitution, specifically the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## Count 2: Fourteenth Amendment Equal Protection Claim
## Discriminatory Expulsion
### (42 U.S.C. §1983- *Mr. Perks, Mr. Thompson, and Mr. Prater against All Defendants*)

150.    Plaintiffs repeat and reallege paragraphs 1-149.

151.    Plaintiffs are a member of a suspect class and were unlawfully discriminated against because of their race.

152.    Plaintiffs were similarly situated in all relevant aspects to non-black HCC students.

153.    Nevertheless, Defendants harassed and ultimately expelled Plaintiffs from HCC because of their race.

154.    All of the actions taken by Defendants were done pursuant to official policies, practices, and customs. All actions taken by Defendants Dorrel and Ingmire were done while acting under the color of state law and had the effect of depriving Plaintiffs of rights secured by the Constitution, specifically the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## Count 3: Title VI of the Civil Rights Act of 1964 Claim
## Maintenance of a Racially Hostile Educational Environment
### (*All Plaintiffs against HCC*)

155.    Plaintiffs repeat and reallege paragraphs 1-154.

156.    Title VI of the Civil Rights Act of 1964 prohibits discrimination by recipients of federal funding against individuals on the basis of race. 42 U.S.C. 2000d.

157.    By targeting Plaintiffs with surveillance, racially offensive comments, and disparate discipline, Defendant HCC has engaged in racial harassment prohibited by 42 U.S.C. §2000d.

158.    By subjecting Plaintiffs with disparate expulsion because of their race, Defendant HCC has engaged in racial discrimination prohibited by 42 U.S.C. §2000d.

159.     This harassment and discrimination by Defendant HCC was so severe, pervasive and objectively offensive that it barred Plaintiffs from access to educational opportunity or benefit.

### Count 4: Fourth Amendment Claim
### Unlawful Searches and Seizures
### (42 U.S.C. §1983-*All Plaintiffs against HCC and Defendant Ingmire*)

160.     Plaintiffs repeat and reallege paragraphs 1-159.

161.     The Federal Constitution protects Plaintiffs from unlawful searches and seizures absent probable cause. *See* U.S. Const. Amend IV.

162.     By regularly conducting searches of Plaintiffs' dormitory rooms and vehicles absent probable cause, Defendants violated Plaintiffs' Fourth Amendment right to be free from unlawful search and seizure.

163.     Defendants' challenged search practices were taken pursuant to official policies, practices, and customs.

164.     Defendants' actions were intentional, willful, wanton, and malicious.

165.     Defendant HCC also maintains written policies requiring students to submit to warrantless law enforcement searches of their dorm rooms and vehicles absent probable cause. These search policies are mandatory, non-negotiable contractual provisions to which all students must agree in order to enroll or receive housing at HCC.

166.     By requiring Plaintiffs to submit to unconstitutional searches as a condition of attending HCC, Defendant HCC has further violated Plaintiffs' Fourth Amendment right to be free from unlawful search and seizure.

167.     Defendant HCC's search policies are therefore facially invalid.

## Count 5: Breach of Contract
### *(Mr. Thompson against HCC)*

168.    Mr. Thompson repeats and realleges paragraphs 1-167.

169.    Defendant HCC made an agreement with Mr. Thompson that he would continue to play for HCC football and receive a scholarship through at least the end of the Fall 2019 semester unless he did not finish the football season.

170.    The representations, promises, and conduct of Defendant HCC were sufficiently specific so that Mr. Thompson had a reasonable expectation that he would receive a scholarship through the Fall 2019 Semester unless he did not finish the football season.

171.    Despite the contract between Mr. Thompson and Defendant HCC, Defendant HCC expelled Mr. Thompson  and charged him for the cost of the Fall 2019 semester for a reason other than not finishing the football season, in violation of his scholarship contract.

172.    Defendant HCC's actions were intentional, willful, wanton, and malicious.

## Count 6: Breach of Implied Covenant of Good Faith and Fair Dealing
### *(Mr. Thompson against HCC)*

173.    Mr. Thompson repeats and realleges paragraphs 1-172.

174.    Pursuant to Kansas law, the agreement between Defendant HCC and Mr. Thompson included an implied covenant of good faith and fair dealing. Defendant HCC's actions complained of herein were undertaken by HCC in bad faith with deliberate disregard for the contractual rights of Mr. Thompson and thus constitute a breach of the implied covenant of good faith and fair dealing.

175.    Defendant HCC wrongfully and intentionally breached the implied covenant to the detriment of Mr. Thompson.

176.    Defendant HCC injured the rights of Mr. Thompson to receive the benefits of the implied covenant.

177.    Defendant HCC's actions were intentional, willful, wanton, and malicious.

27

<u>PRAYER FOR RELIEF</u>

Wherefore, Plaintiffs respectfully pray that this Court:

A.  Enter judgement in favor of Plaintiffs and against Defendants, adjudging Defendants'
    policies and actions to be unconstitutional, and holding Defendants liable to Plaintiffs;

B.  Enter a declaratory judgement in Plaintiffs' favor, adjudging that Defendants' violated
    Plaintiffs rights under the Fourth and Fourteenth Amendments of the Constitution, as
    well as Title VI of the Civil Rights Act of 1964;

C.  Issue an injunction requiring Defendant HCC to reinstate Mr. Thompson's enrollment;

D.  Issue an injunction requiring Defendant HCC to reinstate Mr. Thompson's scholarship;

E.  Issue an injunction requiring Defendant HCC to develop and implement adequate anti-
    racism and anti-discrimination training programs for administrators and campus security;

F.  Issue an injunction enjoining Defendant HCC from conducting warrantless law
    enforcement searches of student dorm rooms and vehicles absent probable cause;

G.  Award Plaintiffs their money damages to the fullest extent compensable by law;

H.  Award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. §1988; and

I.  Allow such other and further relief as the Court deems just and proper.

<u>JURY DEMAND</u>

158.     Plaintiffs respectfully request a jury trial on all issues triable to a jury.

<u>DESIGNATION PLACE OF TRIAL</u>

159.     Plaintiffs designate Kansas City, Kansas as the place of trial in this action.

Dated this 19th day of March, 2020.

Respectfully submitted by,

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF KANSAS

s/ Lauren Bonds
Lauren Bonds            KS # 27807
Zal Kotval Shroff        KS # 28013
6701 W. 64th St., Suite 210
Overland Park, KS 66202
Phone: (913) 490-4110
Fax: (913) 490-4119
lbonds@aclukansas.org
zshroff@aclukansas.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on March 19, 2020, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system which will send notifications of such filing to the e-mail

addresses of all counsel of record.

/s/ Lauren Bonds
Lauren Bonds